James N. Saul, OSB #152809
EARTHRISE LAW CENTER
10101 S. Terwilliger Blvd.
Portland, OR 97219
Telephone: (503)-768-6929
Email: jsaul@lclark.edu

Jonah Sandford, OSB # 154711
NORTHWEST ENVIRONMENTAL DEFENSE CENTER
10101 S. Terwilliger Blvd.
Portland, OR 97219
Telephone: (503)-768-6726
Email: jonah@nedc.org

*Attorneys for Plaintiff Northwest Environmental Defense Center*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL DEFENSE CENTER, an Oregon non-profit corporation, | Case No. |
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES |
| v. | |
| C-2 UTILITY CONTRACTORS, LLC, a Delaware corporation, | (Pursuant to Clean Water Act, 33 U.S.C. § 1365(a)(1)) |
| Defendant. | |

COMPLAINT

## INTRODUCTION

1.      This action is a citizen suit alleging violations of the Clean Water Act ("CWA" or "Act") as amended, 33 U.S.C. § 1251 *et seq*. Plaintiff Northwest Environmental Defense Center ("NEDC") alleges Defendant C-2 Utility Contractors, LLC (hereinafter "C-2") is regularly violating the terms and conditions of its National Pollutant Discharge Elimination System ("NPDES") Permit. This NPDES Permit authorizes discharges of pollutants and stormwater associated with industrial activity from Defendant's facility to waters of the United States. NEDC seeks declaratory and injunctive relief, the imposition of civil penalties, and an award of costs, attorneys' fees, and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction pursuant to 33 U.S.C. § 1365 (CWA citizen suit provision) and 28 U.S.C. § 1331 (federal question). C-2 is in violation of an "effluent standard or limitation" as defined by Section 505 of the CWA, 33 U.S.C. § 1365. The relief requested herein is authorized by 33 U.S.C. §§ 1319(d) and 1365.

3.      Venue is proper in this district because C-2's facility is located within this district. 33 U.S.C. § 1365(c)(1).

4.      NEDC has satisfied the jurisdictional requirements for bringing this suit. In accordance with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), by certified letter dated and postmarked December 21, 2022, NEDC notified C-2 and its registered agent of Defendant's alleged violations of its NPDES permit and the CWA and of NEDC's intent to sue for those violations ("Notice Letter"). In accordance with 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 135.2(a)(1), NEDC sent copies of the Notice Letter on December 21, 2022 to

Defendant's registered agent, the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of the Oregon Department of Environmental Quality ("ODEQ") by mailing copies of the Notice Letter to those individuals via certified mail, return receipt requested.

5.      More than sixty days have passed since NEDC mailed the Notice Letter and the violations complained of are continuing or reasonably likely to continue to occur. Neither the EPA nor the ODEQ has commenced any action constituting diligent prosecution to redress these violations. Defendant is in ongoing violation of the Clean Water Act.

6.      The source of the violations complained of in the Notice Letter is located in Multnomah County, Oregon, and venue is therefore appropriate in the District of Oregon under Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1).

7.      A copy of this Complaint will be served on the Attorney General of the United States, the Administrator of the EPA, and the Administrator of EPA Region 10, as required by 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.4.

**PARTIES**

8.      Plaintiff Northwest Environmental Defense Center is a membership organization suing on behalf of itself and its members. NEDC is an independent non-profit corporation organized and existing under the laws of the State of Oregon. NEDC maintains its principal place of business in Multnomah County, Oregon. Since 1969, the staff, student volunteers, and members of NEDC have advocated for cleaner water and air and for the preservation of public lands and wildlife habitat across the Pacific Northwest.

9.      The mission of NEDC is to protect and conserve the environment and natural resources of the Pacific Northwest. NEDC and its members have a particular interest in, and

COMPLAINT

derive aesthetic, recreational, and other benefits from, Oregon's rivers, streams, lakes, and bays, including the Columbia Slough—the receiving water for Defendant's stormwater discharges— and its associated lakes and wetlands and waters downstream of those waters, as well as the aquatic species that use and rely on those waters. NEDC and its members also work to conserve and protect Oregon's water resources and aquatic species. NEDC's members use waters and adjacent lands downstream from Defendant's discharges for recreational and other activities, including boating, fishing, nature watching, hiking, and aesthetic enjoyment. NEDC and its members intend to continue all of these activities in the future.

10.    Additionally, many members of NEDC live or work near Oregon waters, the Columbia Slough and its associated lakes and wetlands, or otherwise have an interest in these waters. NEDC has one or more members who is or are injured by Defendant's discharges of polluted stormwater and failure to comply with its NPDES permit. Recreational, economic, aesthetic, conservation, health, and/or other interests of NEDC and its members have been, are being, and will be adversely affected by Defendant's unauthorized discharges of pollutants and/or industrial stormwater to the Columbia Slough.

11.    Several of NEDC's members recreate on or near the Columbia Slough in the vicinity of C-2's Facility. These members enjoy canoeing, kayaking, hiking, wildlife observation, photography, and other recreational pursuits on and near the Columbia Slough. These members suffer cognizable injuries as a result of C-2's Clean Water Act violations alleged herein.

12.    NEDC has representational standing to bring this lawsuit. For example, they suffer diminished enjoyment of their recreational experiences due to the knowledge that C-2's polluted stormwater is or may be adversely affecting water quality and animal species that rely

on that water. They are compelled to alter their recreational plans by avoiding the parts of the Columbia Slough directly affected by C-2's polluted stormwater, or by visiting those areas less frequently than they would like. NEDC's and its members' interests in the Columbia Slough and waters downstream are diminished by their polluted state, by Defendant's illegal discharges of pollutants and industrial stormwater, and by Defendant's other NPDES permit violations. These injuries are fairly traceable to the conduct challenged herein. The relief sought in this lawsuit can redress the injuries to those interests.

13.    NEDC has organizational standing to bring this action. NEDC has been actively engaged in a variety of advocacy efforts to improve water quality and to address sources of water quality degradation in Oregon. NEDC's organizational interests have been adversely affected by Defendant's NPDES permit violations. Defendant has failed to fulfill the monitoring, recordkeeping, reporting, planning, and other obligations necessary for compliance with its NPDES permit and the CWA. As a result, NEDC is deprived of information that would further its efforts to serve its members by disseminating information and taking appropriate action. NEDC's efforts to educate and advocate for greater environmental protection for the benefit of its members are thereby obstructed. These injuries are fairly traceable to Defendant's violations and are redressable by this Court.

14.    Defendant C-2 Utility Contractors, LLC is a Foreign Limited Liability Company organized and existing under the laws of the State of Delaware. C-2 operates a communications and pipeline construction facility located at 11618 NE Sumner Street, Suite A, Portland, OR, 97217 (hereinafter "the Facility"). Defendant's Facility discharges stormwater associated with industrial activity via a point source to Portland's municipal storm sewer system and subsequently to the Columbia Slough.

COMPLAINT

## LEGAL BACKGROUND

15.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As relevant here, Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits "the discharge of any pollutant by any person" unless such discharge is authorized by an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

16.     The Act defines the term "person" to mean "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." *Id.* § 1362(5).

17.     The Act also regulates and requires an NPDES permit for stormwater discharges "associated with industrial activity." 33 U.S.C. §§ 1342(p)(2)(B), (p)(3)(A). Federal and state regulations require any person who discharges or proposes to discharge pollutants or stormwater associated with industrial activity to waters of the United States to apply for and obtain an NPDES permit. 40 C.F.R. § 122.21(a); OAR 340-045-0015(2) & (5).

18.     EPA may delegate administration of the NPDES permit program to states with regulatory programs meeting applicable criteria. *Id.* § 1342(b); 40 C.F.R. Part 123. The State of Oregon has established a federally approved state NPDES program administered by the ODEQ. Accordingly, the ODEQ may issue NPDES permits authorizing discharges of pollutants and of stormwater associated with industrial activity to navigable waters within the State of Oregon.

19.     Violation of any limitation, term, or condition of an NPDES permit is a violation of the Act that is enforceable by the district court. The Act authorizes "any citizen" to "commence a civil action . . . against any person . . . who is alleged to be in violation of an effluent standard or limitation under" the Act. 33 U.S.C. § 1365(a)(1). For purposes of citizen

enforcement, "an effluent standard or limitation" includes "a permit or condition of a permit issued under" the NPDES permit program. *Id*. § 1365(f)(7).

20.    The Act gives the district court jurisdiction to "enforce" the NPDES permit terms and conditions that the defendant has violated; to impose "appropriate civil penalties" for those violations; and to "award costs of litigation (including reasonable attorney and expert witness fees)" to a prevailing or substantially prevailing party. 33 U.S.C. § 1365(a), (d).

## FACTS

**A.    Oregon's General NPDES Stormwater Discharge Permit Number 1200-Z and Defendant's NPDES Permit Coverage.**

21.    ODEQ issues general and individual NPDES permits authorizing discharges of pollutants in the State of Oregon. A person seeking coverage under one of ODEQ's general permits must submit certain application materials to ODEQ, which then assigns NPDES permit coverage to the discharger if appropriate.

22.    ODEQ periodically issues a general NPDES permit authorizing discharges of stormwater associated with industrial activity in Oregon. ODEQ's current General Stormwater Discharge Permit Number 1200-Z, which took effect July 1, 2021, (hereinafter the "2021 Permit") authorizes discharges of industrial stormwater from certain facilities, provided the discharges are in compliance with the terms and conditions of the permit. Once a facility obtains NPDES permit coverage under the 1200-Z Permit, a violation of the permit or any condition thereof is subject to citizen suit enforcement. 33 U.S.C. §§ 1365(a)(1), (f)(6).

23.    To reduce and eliminate pollutant concentrations in stormwater discharges, the 1200-Z Permit requires permittees to develop and implement a Stormwater Pollution Control Plan ("SWPCP"); to monitor and report pollutant loadings in stormwater discharged from the

facility; and, in certain circumstances, to revise the SWPCP and implement more comprehensive stormwater management practices over time to protect water quality.

24.     Defendant's facility discharges stormwater associated with industrial activity and other pollutants via a point source stormwater conveyance to Portland's municipal storm sewer system and subsequently to the Columbia Slough.

25.     Since July 1, 2021, ODEQ has authorized stormwater discharges from the Facility by the 2021 Permit, provided those stormwater discharges are in compliance with the terms and conditions of the 2021 Permit. ODEQ assigned Defendant file number 126732. Prior to July 1, 2021, Defendant's stormwater discharges from the Facility were regulated under the 2017 version of the 1200-Z NPDES Permit, which took effect August 1, 2017 and was subsequently reissued on October 22, 2018 (hereinafter the "2017 Permit"). Defendant obtained coverage under the 2017 Permit on March 3, 2020. The 2021 Permit and the 2017 Permit (together "the Permits") are substantially similar, and NEDC alleges ongoing violations of the CWA that began during coverage under the 2017 Permit and are continuing through the present.

26.     Defendant's NPDES Permits prohibit any direct or indirect discharge to waters of the state that is not in compliance with the terms and conditions of the permit. Defendant's NPDES permit also clearly states: "Any noncompliance with any requirements of this permit constitutes a violation of the Clean Water Act," and "[f]ailure to comply with any permit condition…is grounds for enforcement action...." *See* 1200-Z Permit Schedules A.12.a and F.A1.a.

/ / /

COMPLAINT

- 8 -

**B.  Defendant's Violations of its NPDES Permit**

27.     Defendant is discharging pollutants and stormwater associated with industrial activity from the C-2 Facility to the Columbia Slough, in violation of the terms and conditions of its NPDES permit. Defendant's violations of its NPDES permit and the CWA are set forth in Section II of the Notice Letter and are hereby incorporated by reference.

> **(1)     Defendant Violated Its Permit by Failing to Comply with the Permit's Narrative, Technology-Based Effluent Limits and the Control Measures Required to Meet Those Limits.**

28.     Schedule A.1 of the Permits require C-2 to implement the listed narrative, technology-based effluent limits—a variety of best management practices listed in the Permits—to reduce pollutants in stormwater discharged from the Facility. Additionally, Schedule A.2.a of the 2021 Permit (Schedule A.3.a of the 2017 Permit) requires C-2 "to select, design, install, implement, and maintain control measures…to meet the narrative and numeric technology based effluent limits in "Schedule A.1 and Schedule E…of this permit and [to] describe these measures…in the SWPCP." And Schedule A.2.b of the 2021 Permit (Sch. A.3.b of the 2017 Permit) requires C-2 to "…reduce or eliminate pollutants to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."

29.     C-2 violated and continues to violate Schedules A.1, A.2.a, and A.2.b of the 2021 Permit (Sch. A.1, A.3.a, and A.3.b of the 2017 Permit) by failing to meet the narrative technology-based effluent limits in Schedule A.1 of the Permits; by failing to select, design, install, implement, and maintain control measures to ensure compliance with the technology-based effluent limits in Schedule A.1 of the Permits; and by failing to reduce or eliminate

pollutants to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice.

30.    Several specific instances of C-2's violations of Schedules A.1, A.2.a, and A.2.b of the 2021 Permit (Sch. A.1, A.3.a, and A.3.b of the 2017 Permit) have been documented by Portland Bureau of Environmental Services ("BES") staff during Facility inspections. C-2 violated each of these permit conditions on August 20, 2020 because of significant debris accumulation around the Facility, particularly in drainage basins 1 and 2. C-2 also violated each of these permit conditions on August 20, 2020 because its employee training conducted on August 19, 2020 did not include all permit requirements, including specific information regarding control measures to achieve the narrative technology-based effluent limits; housekeeping practices; and monitoring, inspection, reporting, and documentation requirements.

31.    C-2 also violated each of these permit conditions on October 21, 2021, when BES staff again noted significant debris accumulation in drainage basins 1 and 2, including a ring of dark staining around the metal grate at catch basin 1. And C-2 violated each of these permit conditions on October 21, 2021 because its employee training program was still not compliant with all permit requirements, as it did not describe the goals of the permit and how Best Management Practices listed in the SWPCP relate to the goals of the permit. These violations are ongoing or reasonably likely to recur.

32.    C-2's violations of Schedules A.1, A.2.a, and A.2.b of the 2021 Permit (Sch. A.1, A.3.a, and A.3.b of the 2017 Permit) are also demonstrated by the fact that Defendant's stormwater discharges regularly exceed the Permits' numeric benchmarks for several pollutants. Schedule A.5.a-b of the 2021 Permit explains that benchmarks are screening concentrations, exceedances of which require the permittee to assess "whether site controls are effectively

COMPLAINT

reducing pollutant concentrations in stormwater discharges." *See also* 2017 Permit Schedule A.9 (benchmarks "are designed to assist the permit registrant in determining whether its site controls are effectively reducing pollutant concentrations in stormwater discharged from the site." Schedule B.2 of the 2021 Permit establishes the following statewide benchmarks applicable to C-2: total copper 0.017 mg/L; total lead 0.010 mg/L; total zinc 0.24 mg/L; pH 5.5—9.0 S.U.; total suspended solids 30 mg/L; E. coli 406 counts/100 mL; and total phosphorous 0.16 mg/L. Schedule A.9 of the 2017 Permit established the following statewide benchmarks applicable to C-2: total copper 0.020 mg/L; total lead 0.060 mg/L; total zinc 0.24 mg/L; pH 5.5—8.5 S.U.; total suspended solids 30 mg/L; total oil and grease 10 mg/L; E.coli 406 counts/100 mL; and total phosphorous 0.16 mg/L.

33.    Additionally, C-2 discharges to a water body that is not meeting water quality standards for various pollutants, including iron, and Schedule B.4 of the 2021 Permit therefore requires C-2 to monitor for iron and establishes an impairment benchmark concentration for that pollutant of 10.0 mg/L.[1]

34.    As indicated in Tables 1 and 2 below, stormwater monitoring data submitted by C-2 shows that C-2 has repeatedly failed to meet these statewide and impairment benchmark concentrations. The history and pattern of C-2's stormwater sample results that have significantly exceeded the statewide and impairment benchmarks are evidence that C-2 has regularly failed to comply with the narrative technology-based effluent limits in Schedule A.1 of the Permits; has regularly failed to select, design, install, implement, and maintain control measures necessary to meet those limits; and that C-2's site controls are not effectively

---

[1] Schedule B.1.b of the 2017 Permit established a benchmark concentration for iron of 1.0 mg/L.

minimizing pollutants in stormwater discharged from the Facility, and are not reducing or eliminating pollutants to the extent achievable, in violation of Schedules A.1, A.2.a, and A.2.b of the 2021 Permit (Sch. A.1, A.3.a, and A.3.b of the 2017 Permit). These violations have occurred each and every day since March 3, 2020 and are ongoing.

| Table 1 Benchmark Exceedances Reported by C-2 Utility Contractors, LLC. Under the 2017 1200-Z Permit | | | | | | |
|---|---|---|---|---|---|---|
| Pollutant<br><br>**Permit Benchmarks** | Outfall | Total Suspended Solids<br><br>**30 mg/L** | Copper, Total<br><br>**0.02 mg/L** | Zinc, Total<br><br>**0.24 mg/L** | Iron, Total<br><br>**1 mg/L** | Phosphorous, Total<br><br>**0.16 mg/L** |
| 6/15/20 | **001** | 232 | .0453 | | 11.4 | .52 |
| 6/15/20 | **002** | 49 | .0211 | | 2.81 | |
| 6/15/20 | **003** | | | | 1.17 | |
| 11/5/2020 | **001** | 440 | .0742 | .360 | 15.9 | .917 |
| 11/5/2020 | **002** | 123 | | | 4.61 | .474 |
| 11/5/2020 | **003** | 60 | .0436 | | 5.27 | .184 |
| 5/25/2021 | **001** | 336 | .0668 | .359 | 16.8 | .844 |
| 5/25/2021 | **002** | 56 | .0322 | | 3.08 | .188 |
| 5/25/2021 | **003** | 58 | .0213 | | 2.72 | |
| 6/11/2021 | **001** | 92 | .0398 | | 19.3 | .532 |
| 6/11/2021 | **002** | 75 | .0655 | .271 | 7.87 | .265 |
| 6/11/2021 | **003** | 204 | .0901 | .407 | 11.7 | .439 |

| Table 2 Benchmark Exceedances Reported by C-2 Utility Contractors, LLC. Under the 2021 1200-Z Permit | | | | | | |
|---|---|---|---|---|---|---|
| Pollutant<br><br>**Permit Benchmarks** | Outfall | Total Suspended Solids<br><br>**30 mg/L** | Copper, Total<br><br>**0.017 mg/L** | Zinc, Total<br><br>**0.24 mg/L** | Iron, Total<br><br>**10 mg/L** | Phosphorous, Total<br><br>**0.16 mg/L** |
| 3/8/2022 | **001** | 210 | .042 | | 11.5 | .38 |
| 3/8/2022 | **002** | 342 | .064 | | 11.3 | .42 |
| 3/8/2022 | **003** | 127 | .477 | .747 | 10.9 | .6 |
| 4/4/2022 | **001** | 124 | .030 | | | .24 |
| 4/4/2022 | **002** | 56 | .018 | | | |
| 5/2/2022 | **001** | 394 | .065 | .311 | 18 | .71 |
| 5/2/2022 | **002** | 425 | .088 | .383 | 19 | .74 |
| 5/2/2022 | **003** | | .023 | | | .25 |

COMPLAINT

| 5/27/2022 | **001** | 47 | .021 | | | .39 |
|-----------|---------|-----|------|------|----|-----|
| 5/27/2022 | **002** | 50 | .026 | | | |
| 5/27/2022 | **003** | | .023 | | | |
| 11/30/22 | **001** | 191 | .049 | .243 | 11 | .51 |
| 11/30/22 | **002** | 161 | .038 | | | .32 |
| 11/30/22 | **003** | 112 | .352 | .514 | 21 | .39 |
| 12/29/22 | **001** | 354 | .082 | .527 | 28 | .85 |
| 12/29/22 | **002** | 126 | .028 | | | .26 |
| 12/29/22 | **003** | 280 | .123 | .507 | 21 | .66 |

**(2)     Defendant Violated Its Permit by Failing to Maintain and Implement an adequate SWPCP at the Facility.**

35.     Schedule A.2.a of the 2021 Permit (Sch. A.3.a of the 2017 Permit) requires C-2 to describe its pollutant control measures, maintenance schedules, and the frequency of housekeeping measures in its SWPCP. Schedule A.8.c of the 2021 Permit (Sch. A.6.c of the 2017 Permit) requires C-2 to include in its SWPCP each narrative technology-based effluent limit to eliminate or reduce the potential to contaminate stormwater and prevent any violation of instream water quality standards. Schedule A.10 of the 2021 Permit (Sch. A.7 of the 2017 Permit) sets forth the requirements for SWPCPs, including in Schedule A.10.b.vi of the 2021 Permit (Sch. A.7.b.vi of the 2017 Permit) the requirement that SWPCPs include a description of control measures installed and implemented to meet the technology and water quality based requirements in Schedules A.1—A.4 and any applicable sector-specific requirements in Schedule E. Schedule A.8.d of the 2021 Permit (Sch. A.6.d of the 2017 Permit) then requires C-2 to implement the SWPCP and any revisions to it.

36.     C-2 violated and continues to violate these permit conditions by failing to maintain and implement an adequate SWPCP at the Facility. The extensive benchmark exceedances documented in Tables 1 and 2, the extensive water quality violations described herein, and ongoing discharges of polluted industrial stormwater from the Facility demonstrate that C-2 is not maintaining or implementing a SWPCP that includes adequate control measures and all of the required SWPCP components. C-2 has violated Schedules A.2.a, A.8.c, A.10, and

COMPLAINT

A.8.d of the 2021 Permit (Schedules A.3.a, A.6.c, A.7, and A.6.d of the 2017 Permit) each and every day since March 3, 2020 by failing to maintain and implement an adequate SWPCP at the Facility. These violations are ongoing.

      **(3)    Defendant Violated Its Permit by Failing to Comply with the Permit's Water Quality Based Effluent Limitations.**

37.    Schedule A.3.a of the 2021 Permit (Sch. A.4.a of the 2017 Permit) prohibits C-2 from causing or contributing to a violation of instream water quality standards as established in Oregon Administrative Rules ("OAR") 340-041. And Schedule F.A.A6 of the Permits require C-2 to comply with an applicable effluent standards or prohibitions established under OAR 340-041-0033 for toxic pollutants.

38.    OAR 340-041-007(1) states that "the highest and best practicable treatment and/or control of wastes, activities, and flows must in every case be provided so as to maintain…toxic materials…at the lowest possible levels." OAR 340-041-0033(1) prohibits the introduction of toxic substances above natural background levels in concentrations and/or combinations that may be harmful to public health, safety, aquatic life, and wildlife. And OAR 340-041-0033(2) states that levels of toxic substances in waters of the state may not exceed the applicable aquatic life criteria as defined in Table 30 under OAR 340-041-0083.

39.    ODEQ established these and other water quality standards to protect human health and other important beneficial uses such as recreation, drinking water sources, and habitat for salmon and steelhead. Or. Rev. Stat. §§ 468B.015, 468B.048. The Permits established benchmark concentrations for the impairment pollutant iron based on these water quality standards, and also used these water quality standards to establish benchmark concentrations for other toxic pollutants including copper, zinc, and phosphorous. Table 30 in OAR 340-041-8033 identifies the concentrations of toxic pollutants that may be harmful to aquatic life. In its permit

assignment letters to C-2, ODEQ incorporated the iron criterion in Table 30 into the Permits as the impairment benchmark concentration for iron, and used the copper, zinc, and phosphorous criteria to establish benchmarks for those pollutants.

40.     C-2 has violated and continues to violate Schedules A.3.a and F.A6 of the 2021 Permit (Sch. A.4.a and F.A6 of the 2017 Permit) by discharging toxic pollutants from the Facility in amounts or manners that cause or contribute to violations of the narrative and numeric water quality standards identified above. C-2 discharges into a water body (the Columbia Slough) identified as failing to meet water quality standards for iron. As indicated in Tables 1 and 2 above, discharges from the Facility routinely contain iron in concentrations that cause or contribute to violations of the numeric water quality for iron applicable to the Columbia Slough, identified in the 2017 Permit as 1.0 mg/L and in the 2021 Permit as 10.0 mg/L. C-2 violated Schedules A.3.a and F.A6 of the 2021 Permit (Sch. A.4.a and F.A6 of the 2017 Permit) on each day on which concentrations of iron in stormwater discharges from the Facility exceeded 10.0 mg/L, including on: June 15, 2020; November 5, 2020; May 25, 2021; June 11, 2021; March 8, 2022; May 2, 2022; November 30, 2022; and December 29, 2022. These violations are ongoing or reasonably likely to recur.

41.     Further, C-2 has violated and is violating Schedule F.A6 by introducing iron, copper, zinc, and phosphorous above natural background levels in concentrations that may be harmful to public health, safety, aquatic life, and wildlife (OAR 340-041-0033(1)). These violations have occurred each and every day since March 3, 2020 on which there was 0.1 inch or more of precipitation at the Facility because, on information and belief, on those days C-2 discharged industrial stormwater from the Facility that contained copper, zinc, iron, and/or phosphorous in excess of the benchmarks for those pollutants established in the Permits. Specific

examples of these violations occurred on each of the following days when C-2 collected a sample of its discharge that exceeded one or more of the applicable Permit's benchmarks or reference concentration for one or more toxic pollutants: June 15, 2020; November 5, 2020; May 25, 2021; June 11, 2021; March 8, 2022; April 4, 2022; May 2, 2022; May 27, 2022; November 30, 2022; and December 29, 2022. These violations are ongoing or reasonably likely to recur.

42.     Finally, C-2 has violated and is violating Schedule F.A6 by failing to provide the highest and best practicable treatment and/or control of wastes, activities, and flows so as to maintain the lowest possible levels of toxic pollutants. As indicated in Tables 1 and 2 above, discharges from the Facility regularly contain elevated concentrations of the toxic pollutants copper, zinc, iron, and phosphorous. These violations have occurred each and every day since March 3, 2020 on which there was 0.1 inch or more of precipitation at the Facility because, on information and belief, on those days C-2 discharged industrial stormwater from the Facility that contained copper, zinc, iron, and/or phosphorous in excess of the benchmarks or reference concentration for those pollutants established in the Permits. Specific examples of these violations occurred on each of the following days when C-2 collected a sample of its discharge that exceeded one or more of the applicable Permit's benchmarks for one or more toxic pollutants: June 15, 2020; November 5, 2020; May 25, 2021; June 11, 2021; March 8, 2022; April 4, 2022; May 2, 2022; May 27, 2022; November 30, 2022; and December 29, 2022. These violations are ongoing or reasonably likely to recur.

**(4)     Defendant Violated Its Permit by Failing to Comply with the Permit's Monitoring and Reporting Requirements.**

43.     Schedule B.2 of the 2021 Permit (Sch. B.1.a of the 2017 Permit) states that the permit registrant must monitor stormwater discharges for various statewide benchmarks, including total copper, total lead, total zinc, total suspended solids, biochemical oxygen demand,

total phosphorous, and E. coli. Schedule B.4 of the 2021 Permit states that the permit registrant must "monitor for…total iron at all discharge points into impaired receiving waters that correspond with the specific pollutant for which the water body is impaired." *See also* 2017 Permit Schedule B.1.b.i. (requiring monitoring for impairment pollutants identified in the Facility's permit assignment letters). Schedule B.5 of the 2021 Permit states that the permit registrant must "monitor for fecal coliform and enterococcus at all discharge points that correspond to the specific pollutant for which the water is impaired." Schedule B.6 of the 2021 Permit (Sch. B.1 of the 2017 Permit) emphasizes that the permit registrant must monitor for applicable statewide benchmark pollutants and impairment pollutants. Schedule B.7.f and Table 6 of the 2021 Permit (Sch. B.2.f and Table 5 of the 2017 Permit) requires C-2 to monitor stormwater discharges for the above-mentioned pollutants "Four times per year, two samples between January 1 and June 30, and two samples between July 1 and December 31."

44.     C-2 has violated these monitoring requirements. For the 2020-21 monitoring year, beginning July 1, 2020, C-2 collected only three of the required four samples of stormwater discharges. This failure to monitor for applicable statewide benchmarks and applicable impairment pollutants is a violation of Schedules B.1., B.1.b, and B.2.f of the 2017 Permit (Sch. B.2, B.5, B.6, and B.7 of the 2021 Permit). Then, in the 2021-22 monitoring year, beginning July 1, 2021, C-2 violated 2021 Permit Schedule B.7 by collecting samples outside the monitoring frequency outlined in Schedule B.7.f and Table 6, because C-2 failed to collect two samples on or before December 31. These violations are ongoing or reasonably likely to recur.

**(5)     Defendant Violated Its Permit by Failing to Comply with the Permit's Corrective Action and Related Reporting Requirements.**

45.     C-2 violated the Permits by failing to comply with various requirements to undertake corrective action responses and submit corrective action reports. As explained below,

this includes violations of Tier I corrective action requirements in Schedule A.11 of the 2021 Permit (Sch. A.10 of the 2017 Permit), violations of SWPCP corrective action requirements in Schedule A.2 of the 2021 Permit (Sch. A.3 of the 2017 Permit), and violations of corrective action requirements for water quality standard violations in Schedule A.3 of the 2021 Permit (Sch. A.4 of the 2017 Permit).

     i.  *Tier I corrective action violations.*

  46.  Schedule A.11 of the 2021 Permit (Sch. A.10.a and B.7.f.vi of the 2017 Permit) requires C-2 to undertake a Tier I corrective action response each time a stormwater monitoring result exceeds any statewide or sector-specific benchmark, or when visual observations show signs of pollution in the discharge. Specifically, that permit condition requires C-2, within 30 days of obtaining monitoring results demonstrating a benchmark exceedance or completing a monthly visual inspection showing signs of pollution in the discharge, to: (1) investigate the cause of the elevated pollutant levels and develop a plan for controlling significant materials from previous operations; (2) review the SWPCP and evaluate the selection, design, installation and implementation of control measures to ensure compliance with the permit, including evaluating whether any previous pollutant source isolation actions are complete and whether additional modifications are necessary; (3) evaluate treatment measures, infiltration devices and mass reduction measures to see if they were properly installed, maintained and implemented and whether maintenance, correction or modifications are necessary; and (4) assess and implement these corrective actions at all substantially similar discharge points. Per Schedule A.11.c.v of the 2021 Permit (Sch. A.10.a.iv of the 2017 Permit), a Tier I report must include (1) the results of its investigation into the cause of elevated pollutant levels; (2) corrective actions taken or to be taken, or, if determined that no corrective action is necessary, the basis for this determination;

and (3) documentation of whether SWPCP revisions are necessary. Schedule A.11.d.i of the 2021 Permit (Sch. A.10.b of the 2017 Permit) then requires C-2 to implement necessary corrective actions before the next storm event, if possible, or no later than 30 days after receiving the monitoring results, whichever comes first.

47.     As outlined below, C-2 has routinely violated Schedules A.11.c. and A.11.d of the 2021 Permit (Sch. A.10.a.iv and A.10.b of the 2017 Permit) by either failing to complete a Tier I corrective action response, including a Tier I corrective action report, or performing an inadequate corrective action response, including submitting inadequate Tier I corrective action reports.

48.     First, on several occasions C-2 has failed to complete Tier I corrective action responses and reports in response to benchmark exceedances or visual observations showing signs of pollution. C-2 did not complete a Tier I corrective action response and Tier I report within 30 days following receipt of laboratory results for samples collected on June 15, 2020, despite multiple benchmark exceedances on that date. This was a violation of Schedule A.10.a and A.10.b of the 2017 Permit (Sch. A.11.c of the 2021 Permit). C-2 also failed to complete a Tier 1 corrective action response and Tier I report within 30 days following visual observations showing signs of pollution in discharge from the Facility, for observations conducted on the following dates at discharge points 001 and 002: September 23, 2020; October 13, 2020; November 3, 2020; and January 4, 2021. On each of these instances C-2 violated Schedules A.10.a and B.7.f of the 2017 Permit (Sch. A.11.c and A.11.d of the 2021 Permit). These violations are ongoing or reasonably likely to recur.

49.     Next, several of C-2's completed Tier I reports demonstrate that C-2's corrective action responses are deficient and violate Schedule A.11.d of the 2021 Permit (Sch. A.10.b of the

2017 Permit) because the identified corrective actions were not completed or expected to be

completed within 30 calendar days of receiving relevant monitoring results. This includes

corrective actions identified in Tier I reports submitted in response to benchmark exceedances on

November 5, 2020; May 25, 2021; and June 11, 2021. These violations are ongoing or

reasonably likely to recur.

       *ii.*     *SWPCP corrective action violations.*

50.     Schedule A.2.f of the 2021 Permit (Sch. A.3.f of the 2017 Permit) states:

> If modifications to the control measures are necessary to meet the
> technology-based effluent limits in this permit, the permit registrant must
> implement the modification before the next storm event if practicable or no
> later than 30 calendar days from discovering the violation, unless DEQ or
> agent approve a later date.

C-2's failure to minimize pollutant loadings in its stormwater discharges, as illustrated in Section

V.B.1, *supra*, demonstrates that C-2 has violated and is violating this requirement by failing to

take sufficient corrective actions, including revision of its SWPCP and implementation of

modified control measures, even though such corrective actions are necessary to meet the

effluent limits in the Permits. These violations have occurred each and every day since March 3,

2020 and are ongoing.

       *iii.*     *Water quality standard corrective action violations.*

51.     Schedule A.3.b of the 2021 Permit (Sch. A.4.b of the 2017 Permit) requires C-2 to

take certain actions upon becoming aware that a discharge from the Facility caused or

contributed to an exceedance of water quality standards, including: investigating the conditions

that triggered the violation; reviewing the SWPCP to ensure compliance with the permit;

submitting a Water Quality Standards Corrective Action report within thirty days of receiving

the relevant monitoring data, which report must meet certain criteria stated in the Permits; and

implementing any required corrective actions before the next storm event or within thirty days after discovering the violation, whichever comes first.

52.    As explained in Section V.B.3, *supra*, C-2 has routinely caused or contributed to an exceedance of numeric and narrative water quality standards for several toxic pollutants. On each of these instances, C-2 has violated Schedule A.3.b of the 2021 Permit (Sch. A.4.b of the 2017 Permit) by failing to comply with the investigation, reporting, and corrective action requirements in those permit conditions. C-2 violated these requirements each and every day since August 1, 2020 by failing to implement Tier I corrective action responses in the required time frame; failing to review the SWPCP to ensure compliance with the permit; failing to submit each and every required Water Quality Standards Corrective Action report within thirty days of receiving the relevant monitoring data; and failing to implement required corrective actions before the next storm event or within thirty days after discovering the violation, whichever comes first. These violations are ongoing.

**(6)    Defendant Violated Its Permit by Failing to Comply with the Permit's Recordkeeping Requirements.**

53.    Schedule B.16 of the 2021 Permit (Sch. B.10 of the 2017 Permit) requires that C-2 record and maintain certain information at the Facility, including per Schedule B.16.d of the 2021 Permit (Sch. B.10 of the 2017 Permit) documentation of maintenance and repairs of control measures and treatment systems and per Schedule B.16.g of the 2021 Permit (Sch. B.10.f of the 2017 Permit) all inspection reports.

54.    During a stormwater inspection on August 20, 2020 BES staff noted that copies of maintenance logs or receipts for catch basin cleaning, catch basin filter replacement, sweeping, and visual observations were not available. C-2 violated Schedule B.10 of the 2017 Permit on August 20, 2020, and each and every other day in which documentation of maintenance and

repairs of control measures and treatment systems or visual observations were not retained at the Facility and available upon request. These violations are ongoing or reasonably likely to recur.

> **(7)     Defendant Violated Its Permit by Failing to Comply with the Permit's Requirements to Prepare and Submit Noncompliance Reports.**

55.     Schedules F.D6 of the Permits require C-2 to report all instances of noncompliance with the permit not reported under General Condition D4 or D5 at the time C-2 submits monitoring reports. Each noncompliance report must include: (1) a description of the noncompliance and its cause; (2) the period of noncompliance, including exact dates and times; (3) the estimated time the noncompliance is expected to continue if it has not been corrected; and (4) the steps taken or planned to reduce, eliminate, and prevent reoccurrence of the noncompliance.

56.     As described in this Complaint, C-2 has violated the Permits each and every day since March 3, 2020. C-2 violated Schedules F.D6 of the Permits each and every day since March 3, 2020 by failing to prepare and submit noncompliance reports that fully and accurately identify C-2's noncompliance with the Permits and that include all the required information. These violations are ongoing.

> **(8)     Defendant Violated Its Permit by Failing to Comply with the Permit's General Conditions.**

57.     Schedules F.A1 of the Permits require C-2 to comply with all conditions of its Permits. Each and every permit violation described herein is also a violation so Schedules F.A1 of the Permits. C-2 violated these Permit conditions each and every day since March 3, 2020. These violations are ongoing.

58.     Schedules F.A3 of the Permits require C-2 to take all reasonable steps to minimize or prevent any discharge in violation of the Permits. Each and every permit violation

described herein is also a violation of Schedules F.A3 of the Permits. C-2 violated these Permit conditions each and every day since March 3, 2020, by violating the Permits and by failing to take reasonable steps to minimize or prevent discharges in violation of the Permits. These violations are ongoing.

59.     Schedules F.B1 of the Permits require C-2 to "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) that are installed or used by the permittee to achieve compliance with the conditions" of the Permits. C-2 violated these Permit conditions each and every day since March 3, 2020 by failing to properly operate and maintain all systems of treatment and control, including C-2's SWPCP, to achieve compliance with the Permits. These violations are ongoing.

## CAUSE OF ACTION

60.     Plaintiff hereby alleges and incorporates by reference all of the preceding paragraphs.

61.     Defendant C-2 is a "person" within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and is subject to suit under the Act's citizen suit provision, 33 U.S.C. § 1365.

62.     The violations of Defendant's NPDES permit described herein constitute violations of an "effluent standard or limitation" as that term is defined by Section 505 of the Act, 33 U.S.C. § 1365.

63.     Upon information and belief, the NPDES permit violations committed by Defendant are continuing or are reasonably likely to recur. Any and all additional violations of Defendant's NPDES permit and the CWA which occur after those described in NEDC's Notice

Letter but before a final decision in this action are continuing violations subject to this Complaint.

64.    Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendant is likely to continue to violate its NPDES permit and the CWA to the further injury of NEDC, its member(s) and others.

## RELIEF REQUESTED

Wherefore, NEDC respectfully requests that this Court grant the following relief:

A.    Declare that Defendant has violated and continues to be in violation of its NPDES permit and the CWA, as alleged herein;

B.    Enjoin Defendant from operating its facility in a manner that results in further violations of its NPDES permit or the CWA;

C.    Order Defendant to immediately implement a SWPCP that complies with its NPDES permit;

D.    Order Defendant to allow NEDC to participate in the development and implementation of Defendant's SWPCP;

E.    Order Defendant to provide NEDC, for a period of time beginning on the date of this Court's Order granting NEDC relief and running for one year after Defendant achieves compliance with all of the conditions of its NPDES permit, with copies of all reports and other documents that Defendant submits to the EPA, to ODEQ, or to the Portland BES regarding Defendant's NPDES permit at the time those documents are submitted to these agencies;

F.    Order Defendant to take specific actions to remediate the environmental harm caused by its violations;

G.    Grant such other preliminary and/or permanent relief as NEDC may from time to

time request during the pendency of this case;

  H.  Order Defendant to pay civil penalties pursuant to Sections 309(d) and 505(a) of

the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. § 19;

  I.  Award NEDC its litigation expenses, including reasonable attorneys' and expert

witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

  J.  Award such other relief as this Court deems appropriate.

DATED: May 15, 2023.

    s/ James N. Saul
    James N. Saul, OSB # 152809
    EARTHRISE LAW CENTER
    10101 S. Terwilliger Blvd.
    Portland, OR 97219
    Telephone: (503)-768-6929
    Email: jsaul@lclark.edu

    Jonah Sandford, OSB # 154711
    NORTHWEST ENVIRONMENTAL DEFENSE CENTER
    10101 S. Terwilliger Blvd.
    Portland, OR 97219
    Telephone: (503)-768-6726
    Email: jonah@nedc.org

    *Attorneys for Plaintiff Northwest Environmental*
    *Defense Center*

COMPLAINT